# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| G.D., by and through his next friend, S.G.,<br><br>                        Plaintiff,<br><br>           v.<br><br>Kannapolis City Schools Board of Education, Madison Peele, in her official and individual capacity, and Joshua Sain, in his official and individual capacity,<br><br>                       Defendants. | **Case No. 1:22-CV-01001-CCE-LPA**<br><br>**BRIEF IN SUPPORT OF MADISON PEELE'S MOTION FOR SUMMARY JUDGMENT** |

NOW COMES Defendant Madison Peele ("Peele"), by and through undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and LR 56.1, and submits this Brief in support of her Motion for Summary Judgment. DE 85.

## NATURE OF THE MATTER

This matter arises from allegations by Plaintiff, a male minor, that he was the victim of a sexual assault perpetrated by a male classmate ("Student X") on June 10, 2019, and was also repeatedly victimized by Student X during the 2018-2019 academic year. *See* DE 30. Plaintiff has five (5) pending claims against Defendant

Madison Peele ("Peele") for: 1) violation of Title IX in her official and individual capacity; 2) violation of the Equal Protection Clause, in her individual capacity; 3) negligence, including gross negligence, in her individual capacity; 4) negligent infliction of emotional distress ("NIED"), in her individual capacity; and 5) intentional infliction of emotional distress ("IIED"), in her individual capacity. *See*, DE 36 at 17-18.

## STATEMENT OF FACTS

### I.    TRILOGY

The Trilogy Program ("Trilogy") began in 2018, as a collaborative effort between Defendant Joshua Sain ("Sain"), principal of Forest Park Elementary School ("Forest Park") at the time, and Defendant the Kannapolis City Schools Board of Education (the "Board"). Exhibit 1 (Sain Deposition) at 36-37. Trilogy was not a "general education program" (hereinafter "GenEd"); it was a class for students from different grades who had been identified as having mental health or behavioral issues and a history of trauma. *Id*. at 29. Trilogy was designed as an alternative educational program so students could learn how to properly socialize and also receive ongoing therapy, thus offering an "academic, therapeutic, and behavior component" to its students. *Id*. at 30; Exhibit 2 (Peele Deposition) at 185.

Trilogy students were to be monitored at all times, meaning "wherever [the students] went in the building there should be an adult watching." However, no

2

Trilogy-specific policy or "specific rules" existed regarding how to supervise the students in Trilogy beyond "at least one adult monitoring students at all times." Exhibit 1 at 32; Exhibit 2 at 21-22.

The Trilogy classroom had its own individual bathroom located in the classroom. *Id*. at 155. The classroom also had a door that opened directly onto a fenced-in playground where the Trilogy students could take breaks or participate in recess. *Id.* at 97.

## II.    TEACHERS MADISON PEELE AND TONI DAVIS

Peele (DOB July 13, 1992) earned an education degree from UNC-Charlotte in December 2014, and began teaching GenEd students in January of 2015. *Id*. at 8-10. Between 2015 and the fall of 2018, Peele held GenEd teaching positions. *Id*. at 10. She was named the lead teacher for Trilogy in the summer of 2018. *Id*. at 15. Toni Davis ("Davis") was also a general education teacher in the Kannapolis City School system and was Peele's teaching assistant for the 2018-2019. Exhibit 3 (Davis Deposition) at 144.

It was part of Peele's normal custom and practice to allow Trilogy children to go out to the playground for "short breaks" and she would stand in the classroom doorway, with the door open, and monitor the students while they were on the playground. Exhibit 2 at 97. No one told Peele this method of supervision was

improper. *Id*. at 110. Davis also watched students from the Trilogy door to the playground and supervised students that way. Exhibit 3 at 98-99.

## III. PLAINTIFF'S PRE-TRILOGY HISTORY

Prior to joining Trilogy on November 9, 2018, Plaintiff had been suspended from school over 100 times and had been expelled from Kannapolis City Schools. *See*, Exhibit 4 KCBOE_2100-2110 and 2156-2159.

Plaintiff was clinically assessed on September 27, 2017, as "verbally" and "physically aggressive" and he had "become violent and agressive [sic] towards the other students at school as well as in home towards his family members and animals." *Id*. at 2121-2122.

Plaintiff discussed "atypical, bizarre topics such as death and fantasies." *Id*. at 2111-2117. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), Post-Traumatic Stress Disorder ("PTSD"), anxiety, and depression in the fall of 2017. *Id*. at 2118-2120. "[Plaintiff] reported that he does not like to be touched" and "reported that he does not like to be restrained." *Id*.

As of March 21, 2018, Plaintiff "remain[ed] dangerous when prompted to do things he doesn't want to do or when provoked by others." *Id*. at 2162-2168.

On April 26, 2018, Plaintiff was "still struggling with verbal and physical aggression", often prompted by Plaintiff "does not get his way", and he was

4

"fixated" on "death and dying and requires redirection and careful monitoring when he is online." *Id*. at 2158. Plaintiff was again diagnosed with ODD, PTSD, and ADD. *Id*. It was noted "[Plaintiff's] mother has sometimes been unavailable for treatment or struggled to compromise with the treatment team's needs" and that Plaintiff "is reserved and struggles to bond/trust adults." *Id.*

On September 25, 2018, two months before Plaintiff joined Trilogy, S.G. told a clinician that Plaintiff "struggled in school due to the system failing him" and that Plaintiff "is a sexual abuse victim and has suffered a great amount of trauma." *Id*. at 2131.

Immediately prior to joining Trilogy, Plaintiff was supposed to be in therapeutic foster care for a minimum of nine months. *Id*. at 2159. But after only six months, his foster parents gave their thirty day notice because Plaintiff was habitually expelled from after-school programs due to behavioral issues. *Id*. at 2144.

## IV. PLAINTIFF JOINS TRILOGY IN NOVEMBER 2019

Plaintiff joined Trilogy on November 15, 2019. *Id*. at 1694. Student X did not join until January 2019. Exhibit 5 (S.G. Deposition) at 413.

On December 5, 2018, Plaintiff was evaluated by a licensed psychologist. Exhibit 4 at 2100-2110. "Mother reported that [Plaintiff] has a low self-worth and a bully mentality", and that "[Plaintiff] is having a difficult time adjusting to home life after being an only child in foster care. *Id*. at 2. "[Plaintiff] has a history of trauma"

5

including witnessing "domestic violence" between his mother and father, "reportedly molested at the age of 5 by a cousin", and witnessing his older brother's "first seizure." *Id*. The psychologist wrote "[t]his is a great deal of trauma" and noted that Plaintiff's "Mother reported that his outburst began after this time." *Id*. Plaintiff was **again** diagnosed with "Posttraumatic Stress Disorder." *Id*. at 10.

Peele documented episodes of Plaintiff's violent behavior—prior to Student X's enrollment in Trilogy—on November 26, 2018; December 3, 2018; December 5, 2018; and December 18, 2018. *See*, Exhibit 6.

## V.   PLAINTIFF AND STUDENT X MEET IN JANUARY 2019

Once Student X enrolled in Trilogy in January of 2019, he and Plaintiff engaged in "fist fights and name-calling." DE 30 ¶14. Plaintiff and Student X were almost identical in stature, and Plaintiff admitted to "normally" winning physical fights with Student X. Exhibit 7 (Plaintiff Deposition) at 75. Plaintiff testified that one day Student X tried to kiss Plaintiff "on the lips" while riding the bus, so Plaintiff punched him in the face. *Id*. at 99-101.

## VI.   MARCH 21, 2019 TEXT MESSAGES AND CONVERSATION

After Plaintiff punched Student X in the face, on March 21, 2019, S.G. sent Peele a series of three text messages about a conversation Plaintiff had with S.G. about Student X. *See* DE 30-1. In the text messages, S.G. told Peele that Student X was telling Plaintiff "to suck his dick and be his boyfriend and the reason Plaintiff

6

didn't say anything is because Student X told [Plaintiff] that [Student X] would beat [Plaintiff] up [because] [Student X] is bigger and badder than [Plaintiff]. *Id*.; Exhibit 8 at PROTUS-00044. Three minutes later, Peele responded and said "I will talk to [Student X] in the morning." *Id*. Peele reported the text messages to Sain in conformance with school policy. DE 30 ¶15. Peele and Davis both testified that Peele spoke to Plaintiff and Student X, and Peele testified (and later told police) that the boys told her they were just "playing a prank." Exhibit 2 at 71-72; Exhibit 3 at 60-62. There is no evidence in the record that S.G. ever raised this issue with Peele again and, curiously, Plaintiff says he never alerted Peele to alleged sexual harassment by Student X because Plaintiff "didn't want to get in trouble." Exhibit 7 at 149-150.

Peele and Davis both testified that prior to June 10, 2019, they observed **no behavior** during the 2018-2019 academic year to suggest the Plaintiff and Student X were engaged in sexual conduct. Exhibit 2 at 62-63; Exhibit 3 at 60-62. Peele also was never provided documentation that Student X had shown "sexualized behaviors" prior to joining Trilogy. Exhibit 2 at 62-63.

## VII.  MARCH 21, 2019 THROUGH JUNE 10, 2019.

Between March 21, 2019, and June 10, 2019, there is no evidence that Peele, Davis, or anyone else witnessed or was contacted about sexual conduct between

7

Plaintiff and Student X, apart Plaintiff's testimony.[1] Plaintiff testified that he personally saw text messages exchanged between S.G. and Peele after March 21, 2019, regarding sexual conduct between himself and Student X, but the text messages show otherwise. Exhibit 8.

S.G. "asked [Plaintiff] if Ms. Peele was keeping [Student X] away from him, that's pretty much the extent. I thought it was taken care of." Exhibit 5 at 131:1-3. In his answers to Interrogatories, Plaintiff also failed to mention either a phone call or an in-person conversation between Peele and S.G. subsequent to March 21, 2019. Exhibit 9 at 3-4.

S.G. never brought up sexual conduct at IEP meetings on April 19, 2019, or May 29, 2019, where the discussion was almost solely related to getting Plaintiff more time at school, and never about any efforts to restrict contact between Plaintiff and Student X. Exhibit 5 at 393-395.

> Q: … During that May 29, 2019, [IEP] meeting, do you recall raising any concerns that [Plaintiff] was now going to have an additional day to be exposed to [Student X]?
> **A: No. I thought Ms. Peele had handled it, and I thought that's why we were having these progresses [in Plaintiff's behavior at school]."**

*Id*. at 123:23 – 124:3. S.G. never made a complaint to Sain or anyone else about Peele—for any reason—during the 2018-2019 academic year. *Id*. at 489:1-22.

---

[1] On November 29, 2023, S.G. testified that the only time subsequent to the March 21, 2019, text messages that she mentioned sexual conduct to Peele was in person, the same day, and shortly after the text messages were sent. Exhibit 5 at 105:18 – 106:22.

## VIII. JUNE 10, 2019 INCIDENT

The primary allegation in the Amended Complaint is that Student X anally raped Plaintiff on the playground on June 10, 2019 (the "Incident"). That day, Peele and Davis were present and Plaintiff, Student X, and one other student were present. Exhibit 2 at 88-89. Video records show that Plaintiff went to the playground at 11:09 AM, Student X went to the playground at 11:16 AM, and both students were called back to the classroom by Peele at 11:30 AM. DE 30-2 at 6.

Sain testified that Peele was shown on video standing in the doorway with the door propped open the entire time. Exhibit 1 at 76-77. Peele and Davis both testified that Peele was standing in the playground doorway monitoring Plaintiff and Student X for the entire fourteen minutes they were on the playground. Exhibit 2 at 89-90; Exhibit 3 at 84.

At one point, the boys went behind a sign language board, and Peele could see both boys' legs. Exhibit B at 103. Plaintiff was asked, "[d]id you think that the teacher's view was obstructed by the sign language board?", to which he answered, "I really don't remember." Exhibit 7 at 85. Plaintiff erroneously testified that the sign language board was only "2 or 3 inches" off the ground, even though it is substantially higher. *Id*. at 84:6-25.

Peele observed "something going on behind the sign language board" that looked like "awkward movements." Exhibit B at 104-106. Peele then called the boys

9

over and told them, and physically demonstrated, that she saw G.D. "bobbing his knees." Exhibit 2 at 116-117; DE 30-2 at 1. Plaintiff testified Peele called the boys over, but that she was (somehow) "behind a glass door" while calling them over. Exhibit 7 at 83.

After some contradictory statements, Plaintiff eventually admitted that he had assaulted Student X. Exhibit 2 at 127; Exhibit 3 at 96. Peele also immediately memorialized this admission by Plaintiff. *See*, DE 30-2 at 1 ("I asked [Plaintiff] if [Student X's story] was true and [Plaintiff] said yes").

Plaintiff also later admitted **he did not have anal sex with Student X**. Exhibit 7 at 76-78.[2] Plaintiff said that Student X tried to penetrate Plaintiff anally with Student X's penis, but "failed." *Id*. Plaintiff also testified that Plaintiff tried to penetrate Student X's anus with Plaintiff's penis, but also could not do so. *Id*.

At his deposition Plaintiff also claimed—for the first time—that he and Student X engaged in oral sex on June 10, 2019. *Id*. at 68.

## IX.   POST-INCIDENT INVESTIGATION AND RECORDS

Alex Quigley was the lead investigator for the Kannapolis City Police assigned to the case. S.G. testified that on June 10, 2019, Quigley called S.G. and "told me that [Plaintiff] was the one who had been raped, and I need to take him for

---

[2] Plaintiff tells different and contradictory versions of what happened with Student X during the Spring of 2019 on 1) June 10, 2019; 2) June 12, 2019 at his CAC Interview; on June 26, 2019 to a psychiatrist; and 4) at his deposition on November 30, 2023.

a Sane screen." Exhibit 5 at 167:11-23. S.G. further testified that Quigley told her he believed Plaintiff was the victim and Student X sexually assaulted Plaintiff. *Id*. at 170:10-21. But Quigley testified that both statements were false. Exhibit 10 at 30-31; 49. Quigley explained that it was Plaintiff who was being investigated as the assailant, in light of Plaintiff's admission to Peele and Davis that Student X's story was true. *Id*. This is reflected in the confidential KPD report, which lists Student X as "victim" and Plaintiff as "suspect." *Id*. at 30-33.

At his SANE screening on June 10, 2019, the records show "10 y/o male with a past medical history of ADHD and PTSD who presents after a sexual assault" when "another 10 y/o boy in his class sexually assaulted him today on the playground." Exhibit 4 at 1618. S.G. told the physician that Plaintiff "was raped on playground at school today." *Id*. Plaintiff reported that "child inserted their penis into his anus" but also that "[n]o physical assault took place" and Plaintiff denied "any physical complaints." *Id*. The physician noted Plaintiff's "anus appears normal without any evidence of external trauma." *Id*. The physician confirmed in her narrative, "I was present for the physical exam. I do not see any evidence of external trauma." *Id*. at 1619.

Yet, on June 26, 2019, S.G. told a psychiatrist that a boy "was caught raping" Plaintiff. *Id*. at 2203. Plaintiff again said the other child had been "grooming him",

but that "[t]hroughout Trilogy his behavior was difficult due to anger", and Plaintiff admitted that "**[n]obody knew what was going on**." *Id*.

## X.    PLAINTIFF'S RECORDS SHOW IMPROVEMENT

On December 5, 2019, "[Plaintiff] likes his school and nobody is bothering him." *Id*. at 2211. On January 2, 2020, "Plaintiff is coping [well] at school" and "is completing his homework at this time without any major complaints." *Id*. at 2213. On May 20, 2020, S.G. told a psychiatrist that a "DNA test showed [Plaintiff] was raped" but that Plaintiff "has been very sweet with decrease[d] rage attacks as the medicine seems to work. He is stable at this time… He is doing his school work with no problem." *Id*. at 2223.

On September 9, 2020, "[Plaintiff] even tried to interfere and help with another student who was upset at his teacher." *Id*. at 2231. On October 8, 2020, Plaintiff's "teachers and mother [were] very proud of him" and it was noted that "he has done very well. [T]oday he told his mother he is behind in school which mother thinks is a very big step." *Id*. at 2233. On December 16, 2020, Plaintiff had "been doing very well on his medication and has been complaint with no side effects", and other than his sleep S.G. "has no other major concerns." *Id*. at 2237. In fact, Plaintiff's psychiatrist noted Plaintiff "surprisingly was very cooperative and responded to most of the questions that I asked. Usually he makes his mom talks

[sic] for him." *Id*. Plaintiff said, "**he has no issues at school which was confirmed by his mother**." *Id*. (emphasis added).

On May 11, 2021, S.G. told a psychiatrist Plaintiff "is doing well", "is coming out of his shell", "is stable on his medications", "is getting along with his peers", his "teacher has no issues", and Plaintiff "is not depressed or anxious." *Id*. at 2245.

## XI.   TRILOGY POST-INCIDENT

Following the Incident, Peele was sent a letter dated June 13, 2019, that she was being suspended, with pay, until an investigation was completed. Exhibit 2 at 143-144. Following that investigation, Peele was sent another later dated June 25, 2019, offering her the opportunity to return to Forest Park as the lead teacher for Trilogy. *Id*. at 144-146.

## PROCEDURAL HISTORY

Plaintiff filed his original Complaint on November 21, 2022. DE 1. He filed his Amended Complaint on March 21, 2023. DE 30. In the Joint Rule 26(f) Report filed on June 1, 2023, Plaintiff agreed to a deadline of August 31, 2023, to disclose reports from any retained experts. DE 40 at 2. On June 2, 2023, the assigned Magistrate Judge issued a Text Order adopting the Joint Rule 26(f) report, but clarified that the deadline to disclose expert reports would also apply to "any expert disclosures required by Federal Rule of Civil Procedure 26(a)(2)(B)." DE Text Order

13

of June 2, 2023. Plaintiff did not disclose any retained expert witnesses or reports before the deadline, nor after it.

On November 2, 2023, the parties jointly moved to extend the case deadlines. DE 54. Even though the deadline had already passed, the parties requested that Plaintiff be given until December 1, 2023, to disclose as non-retained expert witnesses "individuals identified in the Kannapolis City Police Department's file … particularly as it relates to DNA and physical evidence." Id. at ¶7(a). On November 30, 2023, Plaintiff disclosed a list of potential non-retained expert witnesses. *See*, Exhibit 11. On December 14, 2023, Peele served objections to Plaintiff's non-retained expert witness disclosures. *See*, Exhibit 12.

## QUESTIONS PRESENTED

1. Is there a legal basis for a Title IX claim against a teacher?

2. Is there a legal basis for Plaintiff to succeed on an Equal Protection Clause claim against Peele?

3. Has Plaintiff established that an alleged sexual assault was foreseeable?

4. Has Plaintiff established that his alleged injuries were proximately caused by Peele's alleged breach of duty?

5. Is there a genuine issue of fact as to the Plaintiff's claim for negligent infliction of emotional distress?

14

6.     Is there a genuine issue of fact as to the Plaintiff's claim for intentional infliction of emotional distress?

## STANDARD OF REVIEW

Summary judgment "shall" be granted to a movant when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A movant must support the position that there is no genuine dispute on a material fact either by reference to "materials in the record", or that the nonmovant will not be able to present a jury with evidence to "support [a] fact." *Id*. In situations where "factual context renders" a plaintiff's claim "implausible", plaintiff "must come forward with more persuasive evidence than would otherwise be necessary." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When "the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (per curiam ), or is not significantly probative, summary judgment may be granted." *Id*. Summary judgment is an "integral" mechanism of the Federal Rules of Civil Procedure, "which are designed to secure the just, speedy and inexpensive

determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555, 91 L. Ed. 2d 265 (1986). To wit:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id*. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).

## ARGUMENT

### I.   TITLE IX

The Supreme Court has confirmed that Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals[.]" *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 796, 172 L. Ed. 2d 582 (2009). To the extent Plaintiff can state a cognizable Title IX claim against Peele, the requisite showing of "deliberate indifference" is conspicuously absent here, given Peele's reporting of the March 21, 2019 text messages to Sain, and her constant and open line of communication with S.G.

16

This claim has no merit and should be dismissed.

## II. <u>EQUAL PROTECTION CLAUSE</u>

"To demonstrate a Fourteenth Amendment claim, a plaintiff must demonstrate discriminatory effect by showing the unequal treatment of a person or persons as compared to other similarly situated individuals." *Nance v. City of Albemarle, N. Carolina*, 520 F. Supp. 3d 758, 780 (M.D.N.C. 2021); *see also*, *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002).

Plaintiff alleges that Peele was a "policymaker" who implemented the Board's "unconstitutional policies or customs." DE at ¶43. Plaintiff concludes that the policies "constituted disparate treatment and harassment of male students and subsequently had a disparate impact on the male students within the school system." *Id*. at ¶43. Plaintiff's claim relies on showing the disparate treatment of "male" students but he has failed to present evidence that he was directly affected by a discriminatory practice by Peele in a class of only male students. "Merely alleging disparate treatment is insufficient to trigger the protection of the Equal Protection Clause," *Frye v. Brunswick Cnty. Bd. of Educ.*, 612 F. Supp. 2d 694, 706 (E.D.N.C. 2009), and Plaintiff's Fourteenth Amendment claim against Peele should be dismissed.

17

## III.   NEGLIGENCE

Summary judgment is rarely granted as to claims of negligence. *Blackmon v. Tri-Arc Food Sys., Inc.*, 246 N.C. App. 38, 42, 782 S.E.2d 741, 744 (2016). But "rarely does not mean never." *Borneman v. United States*, 213 F.3d 819, 828 (4th Cir. 2000) (cleaned up). Because Plaintiff's negligence claim is not forecasted by the evidence and fails to establish every element "beyond mere speculation or conjecture", it is properly dismissed via summary judgment. *Blackmon* at 42.

### A. Plaintiff's Alleged Injuries Were Not Foreseeable

In North Carolina, a teacher is held to a "reasonable teacher" standard, which means that she must "abide by that standard of care which a person of ordinary prudence, charged with [her] duties, would exercise under the same circumstances." *Kiser v. Snyder*, 21 N.C. App. 708, 710, 205 S.E.2d 619, 621 (1974) (cleaned up). A school and its teachers do not have an absolutely duty to ensure that students are safe from every possible harm. *See*, *Payne v. N. Carolina Dep't of Hum. Res.*, 95 N.C. App. 309, 313, 382 S.E.2d 449, 451 (1989). Rather, they are liable only for "foreseeable injuries that result from a lack of teacher supervision." *Id.* (Upholding Industrial Commission's decision to dismiss sixteen-year-old's negligence claim predicated on a teacher's failure to warn because "to hold otherwise is to require the instructor to issue warnings about every imaginable circumstance and is far outside the standard of reasonable foreseeability").

The North Carolina Court of Appeals upheld a directed verdict[3] on a negligence claim asserted by plaintiff who was injured while unsupervised by a teacher in her sixth-grade class. *See*, *James for James v. Charlotte-Mecklenburg Bd. of Educ.*, 60 N.C. App. 642, 300 S.E.2d 21 (1983). In *James*, the plaintiff was a minor in the sixth grade at a public school. *Id*. at 643. On the date of the injury, approximately thirty (30) students were in the classroom with no adult supervision. Two students in plaintiff's class started "sword fighting" with pencils. *Id*. During the "sword fight", one of the pencils was sent flying through the air and struck plaintiff in her eye. *Id*. Plaintiff "ultimately lost the sight in her left eye." *Id*.

Affirming the directed verdict, the Court analyzed three analogous North Carolina Supreme Court decisions centered on the question of whether an injury was foreseeable and held that plaintiff's injury was not foreseeable, as a matter of law. *Id*. at 648. The same result is appropriate here.

Taking all the evidence in Plaintiff's favor, evidence that a sexual assault by Student X against Plaintiff was foreseeable is limited to three text messages and one conversation where S.G. told Peele to keep Student X away from Plaintiff. The record shows that when Student X attempted to kiss Plaintiff in March 2019, Plaintiff

---

[3] This is a distinction without a difference because the "standard for judgment as a matter of law under Rule 50(a) mirrors the standard for granting summary judgment such that the inquiry under each is the same." *Hunter v. Town of Mocksville*, 201 F. Supp. 3d 750, 754 (M.D.N.C. 2016) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000) and *Anderson* at 250–51) (cleaned up).

"felt threatened" and in response, Plaintiff punched Student X in the face. Plaintiff confirmed that he usually won fist fights with Student X.

Plaintiff never told anyone that he was engaging in sexual conduct with Student X. Plaintiff never spoke to Peele about this conduct. S.G. never brought up any alleged conduct between G.D. and Student X after March 21, 2019, and did not raise it at IEP meetings in April and May of 2019. At Plaintiff's May 2019 IEP meeting, with only two weeks remaining in the school year, **S.G. was campaigning for Plaintiff to have more time in the Trilogy program, not less**. S.G.'s actions establish that she was not concerned about Student X and Plaintiff interacting for almost three months leading up to June 10, 2019. S.G. had the opportunity to raise a concern to Peele between March 21, 2019, and June 10, 2019, but she never did.

In short, the evidence does not permit a conclusion that Peele ignored ongoing concerns about sexual harassment.

### B. Peele Properly Communicated, Investigated and Supervised the Boys

Plaintiff has not identified any policy that Peele failed to abide by or shown that Peele did something improperly as the Trilogy teacher. Peele kept meticulous records, and communicated with S.G. early in the morning, late at night, and even while Peele was on vacation. *See*, Exhibit 8. Plaintiff admits Peele went to Sain immediately after receiving the text messages from S.G. in March 2019.

20

On June 10, 2019, Peele could see the legs of Plaintiff and Student X when they were behind the sign language board and she was watching them. Peele was never instructed to chase the boys around the playground if they became partially obstructed by the playground equipment. Peele saw something unusual happening, called to Davis, and called to the boys. Plaintiff did not cry out for help or run to Peele for help after the fact; Peele saw something unusual, and she acted. There is no evidence Peele was not watching them. She watched them from the doorway, which is something Peele and Davis did throughout the year, a practice that satisfies the policy of monitoring the students "at all times." A reasonable jury could not conclude that Peele breached a duty to Plaintiff.

### C. Plaintiff Cannot Prove Proximate Causation

Even if a jury were to find there was a duty breached by Peele, Plaintiff has not presented competent evidence that his alleged injuries were caused by it, or that certain injuries exist at all. In North Carolina, a plaintiff has the burden to establish that a defendant's breach "was a proximate cause of the injury suffered by the plaintiff." Moreover, "if the evidence be so slight as not reasonably to warrant the inference of proximate cause, the court will not leave the matter to the speculation of the jury." *Conley v. Pearce-Young-Angel Co.*, 224 N.C. 211, 29 S.E.2d 740, 742 (1944). Where only the plaintiff's testimony was evidence of causation that an "elevator malfunction exacerbated his claustrophobia, PTSD, depression, anxiety,

21

and GERD", the Fourth Circuit held that "such lay testimony is insufficient to establish causation with respect to the injuries alleged in this case; under these circumstances, evidence from a medical expert is required." *Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 176 (4th Cir. 2020).[4]

Plaintiff has a host of mental health issues documented in his medical records. Plaintiff is seeking recovery from Defendants on these injuries and damages:

> G.D. was forced to attend a private school after Defendants failed to protect G.D. from a known danger. G.D. has continued to suffer from severe emotional distress, including being unable to be touched or hugged and having continual anxiety. Furthermore, Plaintiff has a difficult time trusting teachers or school administrators as a result of Defendants' actions. G.D. was diagnosed with posttraumatic stress disorder and an anxiety disorder combined with a presentation of depression. Plaintiff further refers to the production of documents showing G.D.'s medical expenses and tuition upon his departure from Kannapolis City Schools. Plaintiff reserves the right to supplement this response.

Exhibit 9 at 2.

With the exception of Plaintiff attending private school, all of those alleged injuries either: 1) existed prior to January 2019, when he first encountered Student X; 2) lack evidentiary support; or 3) are unsupported by the opinion of a medical expert. Plaintiff's PTSD, anxiety, and depression, for example, were diagnosed before 2019. Thus, he would have to provide evidence that this experience

---

[4] Unpublished opinion, attached as Exhibit 13.

exacerbated these conditions (no records exist), and it would have to be supported by the opinion of a medical expert (no retained or non-retained medical experts or reports were disclosed). Plaintiff also had issues being touched and trusting adults prior to January 2019. Plaintiff is precluded from presenting those injuries to a jury because there is no evidence of proximate causation.

### D. No Evidence of Gross Negligence

The seminal case on gross negligence in North Carolina is *Yancey v. Lea*, 354 N.C. 48 (2001), where the North Carolina Supreme Court held that "an act or conduct rises to the level of gross negligence when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others." *Yancey* at 53 (emphasis in original). The difference between ordinary negligence and gross negligence is not a question of "degree or magnitude or inadvertence or carelessness, but rather is intentional wrongdoing or deliberate misconduct affecting the safety of others." *Id*. Gross negligence is sometimes defined as when a defendant exhibits "willful or wanton" behavior, which is "conduct that falls somewhere between ordinary negligence and intentional conduct." Specifically:

> An act is wanton when it is done of wicked purpose or when done needlessly, manifesting a reckless indifference to the rights of others. An act is willful when there exists a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, a duty assumed by contract or imposed by law.

*Lovett v. Univ. Place Owner's Ass'n, Inc.*, 2022-NCCOA-594, ¶ 13, 877 S.E.2d 447, 449 (citing *Boyd v. L.G. DeWitt Trucking Co.*, 103 N.C. App. 396, 402, 405 S.E.2d 914, 918 (1991) (cleaned up).

Plaintiff has provided no evidence that Peele was either recklessly indifferent to Plaintiff or consciously failed in her duties to Plaintiff as his teacher. The hundreds of text messages between Peele and S.G. show a compassionate and devoted teacher. Plaintiff **admits** Peele contacted Sain about the March 2019 text messages. Plaintiff has not advanced any theory as to when, how, or why Peele was grossly negligent. The evidence fails to establish a fact issue as to gross negligence and it should be dismissed.

## IV.    NIED

For the same reasons as discussed above, and an additional legal reason, Plaintiff's NIED claim cannot proceed to a jury. An NIED claim has three elements: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress, … and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). A difference between ordinary negligence and NIED is the required predicate showing of damages, with a higher burden for an NIED claim. *Horne v.*

24

*Cumberland Cnty. Hosp. Sys., Inc.*, 228 N.C. App. 142, 149, 746 S.E.2d 13, 20 (2013). Specifically, a plaintiff must prove that he or she suffered severe emotional distress, which North Carolina Courts have defined as "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id*. A plaintiff must present "factual allegations regarding the type, manner, or degree of severe emotional distress" to satisfy NIED's third element. *Id*.; *see also*, *Edwards v. JPMorgan Chase Bank, N.A.*, No. 1:20-CV-128, 2020 WL 1814423, at *4 (M.D.N.C. Apr. 9, 2020) (granting motion to dismiss on NIED claim).[5]

As discussed above, the record does not show that Plaintiff has suffered a disabling emotional or mental condition diagnosed by professionals trained to do so either 1) caused directly by the Incident; 2) or exacerbated by the Incident. Plaintiff has not disclosed any retained or non-retained expert who can opine on this issue, so Plaintiff has no way to prove the third element for NIED at trial.

## V.   IIED

To support a claim of IIED, a plaintiff needs to establish that a defendant engaged in "1) extreme and outrageous conduct; 2) which is intended to cause and

---

[5] Unpublished opinion attached as Exhibit 13.

does cause (3) severe emotional distress." *Foster v. Crandell*, 181 N.C. App. 152, 167–68, 638 S.E.2d 526, 537, writ denied, review denied, 361 N.C. 567, 650 S.E.2d 602 (2007). Again, it is undisputed that Peele received the March 2019 text messages from S.G. about sexual conduct and reported it to Sain. This fact alone dispels any notion that her conduct was extreme, outrageous, or intended to harm Plaintiff. If Peele wanted to cause Plaintiff extreme emotional distress, she would have ignored S.G.'s text messages about sexual conduct, and the hundreds of other text messages S.G. sent her in 2019. Plaintiff says Peele did not care about him, but her frequent communications with his mother show otherwise and Plaintiff admits he never raised any issues with Peele. No evidence supports the IIED claim so it should be dismissed as a matter of law.

## CONCLUSION

Plaintiff "is not entitled to a trial merely because he wants one." *Lewis v. Durham Wellness & Fitness*, No. 1:17-CV-217, 2019 WL 1573675, at *2 (M.D.N.C. Apr. 11, 2019).[6] For the reasons stated above, summary judgment is warranted in favor of Peele.

---

[6] Unpublished opinion attached as Exhibit 13.

This the 17th day of March 2024.

**WOMBLE BOND DICKINSON (US) LLP**

s/ Alexander J. Buckley
Alexander J. Buckley (NCSB No. 53403)
Sean F. Perrin (NCSB No. 22253)
301 S. College Street, Suite 3500
Charlotte, North Carolina 28202
E-mail: Sean.Perrin@wbd-us.com
E-mail: Alex.Buckley@wbd-us.com
*Attorneys for Defendant Madison Peele*

CERTIFICATION OF WORD COUNT

I certify that this filing contains 6,245 words (excluding those parts set forth in Local Civil Rule 7.3(d)(1)) and therefore complies with the word-count limits set forth in Local Civil Rule 7.3(d)(1).

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was filed with the Court's CM/ECF system which will send a copy to all users registered to receive notice.

This the 17th day of March 2024.

/s/ Alexander J. Buckley
Alexander J. Buckley (NCSB No. 53403)