Exhibit 5

**What grade was [Plaintiff] in when he transitioned to homebound instruction?**

A. Second grade.

**Q. So, he was in second grade, and was it near the end of the second grade year?**

A. Summer or -- I mean, it was -- I'm trying to think. When was it? I know the IEP was at Bonnie West's office. I'm not sure when -- I'm not -- I just know that we had multiple IEPs, and this was something that was pitched at a -- by Bonnie West at an IEP.

**Q. Okay. Thanks. So, I am going to take this.**

**After you had the conversation in the kitchen with [Pla.] in March of 2019, you sent an e-mail to Ms. Peele or a text message to Ms. Peele, correct?**

A. Yes, ma'am.

**Q. Okay.**

A. I'm sorry, yes.

**Q. Do you recall ever raising the issue again with Ms. Peele?**

A. In regards to [Student X]?

**Q. Yes.**

A. I mean, not in evidence. I mean, I don't have text messages of it, but we spoke on the phone often. I told her, literally, to keep that child away from my son, that she knew he had a history of victim -- that



he was a victim of sexual abuse, and that he had a history of falling into that grooming stage of people that were trying to get him to do things that he didn't want to do.

**Q. Do you recall when that conversation was?**

Yeah. It was -- it was around the time -- it was around the time of the text messages. I talked to her in person. [Plaintiff] had a day that he was sick and he had to go home early or something, they said he wasn't feeling well, and I went to the school and I talked to her in person. I think that's also when I found out that she was pregnant or that she was carrying.

**Did you talk to anyone else at the school or with the school regarding these concerns with [Student X]?**

A. I honestly can't remember. I'm not -- I, honestly, can't remember. I -- honestly, I'm not sure. I mean, Mr. Davis was a counselor there. He was -- he was a guy that would come and spend time and see [Pla.]. He would come to the Trilogy classroom a couple times a week, but from my last -- from the last understanding, he doesn't work there anymore.

**Q. Mr. Davis?**

A. Yeah.

**Q. Do you remember his first name?**



**that [Plaintiff] would not be returning for the next school year; is that correct?**

A. Yes, ma'am.

**Q. Okay.**

A. Do you want to know what the day treatment was? It wasn't --

**No, I do not, [S.G.]. If I did, I will ask you, I promise.**

A. Okay.

**I will take that. Thank you.**

**[S.G.], I believe testimony earlier was that you didn't recall whether you raised any issues with [Stu. X] at the IEP meetings after the March 2019 text message; is that right?**

A. I'm not sure.

**Okay. Do you recall whether you expressed any concerns with the increase in [Plaintiff]'s attendance at school at the May 29th IEP meeting?**

A. Did I -- I'm sorry, elaborate what you are asking me.

**So, you've got concerns that [Plaintiff] is in proximity to [Student X], and now [Plaintiff] is being added -- he's having an entire day of school added to his schedule in which [Student X]is his classmate. During that May 29, 2019, meeting, do you recall raising any concerns that [Plaintiff] was now going to have an additional day to**



**be exposed to [Student X]?**
A. No. I thought Ms. Peele had handled it, and I thought that's why we were having these progresses.
**Okay. You used the term earlier, in regards to [Student X], you used the term "grooming." Do you recall that?**
A. Yes.
**Q. Okay. Can you tell me what you understand the term "grooming" or "groom" in the context of sexual abuse to mean?**
A. Well, it's -- it was explained to me by the advocacy center that grooming is when someone that sexually assaults or has wrongful intentions with another person, they get them to trust them. They get them to believe that they are their friend. They get them to believe that they are a safe place or they trust them, they are their friend, or, you know, it's a -- it's a way of getting them to be manipulated into doing something with them later on.
**Q. Do you under- -- is it your understanding that in order -- that in a typical situation that grooming would have a power dynamic, that the groomer would be, perhaps, in a position of greater power than the person being groomed?**
A. Yes.



-- and the playground, no. I asked if -- I asked if Ms. Peele was keeping [Student X] away from him, that's pretty much the extent. I thought it was taken care of.

**Q. Okay. And you've never met [Student X]?**

A. No, ma'am. Not that I can recall. I don't -- not that I know of.

**Q. Has [Plaintiff] ever had a girlfriend?**

A. Yeah. He has one now, almost an entire year in December.

**Q. Is that his first girlfriend?**

A. It is. Her name is [Redacted].

**Q. Does he go to school with her?**

No. He did. He met her on the bus. When he come back -- when he came back to city of Kannapolis school system, he was going to the middle school, and that's -- he met [Redacted] when he was attending the middle school.

**Has he ever expressed interest in another girl?**

**Before he started dating [Redacted], did he ever express interest in another girl?**

Yeah. There was this girl at [Redacted], her name was [Redacted]. And she had little [Redacted] in her hair, and she had the biggest crush on [Plaintiff], and she'd run up to him and giggle with her



"Clothes off."

**Q. Okay.**

A. And then I kind of didn't want to know more right then. I was just waiting for the call to come in to kind of get more clarification. He didn't really want to talk about it.

**Q. Did you believe him at that point in time?**

A. Yes.

**Q. Okay. And you say Officer Quigley called?**

A. Yes, sir.

**Q. Okay. Tell me about the call with Officer Quigley and what happened with Officer Quigley.**

He said, "Is this -- is this [S.G.]?" And I said, "Yes, sir." He said, "I'm Officer Quigley, detective with KPD or Kannapolis Police Department." And he said, he said, "Ma'am, do you understand the allegations of why I am calling you?" And I said, I said, "No, sir, I don't -- I don't know what -- what's going on." And he told me that basically that I needed to take [Plaintiff], that -- in my conversation with Officer Quigley, he told me that [Plaintiff] was the one that had been raped, and I needed to take him for a SANE screen.

**Q. Okay.**

A. And that's what I did.



take him now." And he said, "They are expecting him to Atrium," to go down to Northeast.

**Q. And did you take him straight to Atrium?**

A. Absolutely.

**Q. Did you bring the clothes that he was wearing when he was home from school?**

A. He was still in the same clothes.

**Q. So, that would be yes?**

A. Oh, yes, sir. He was in the same clothes.

**Q. Okay. And that's fine.**

**So, tell me what happened when you got to Atrium.**

We went into the emergency department. They asked us why we were there, and I leaned in, and I said, "Officer Quigley told us that you guys were expecting my son." And they asked me his name, and I said that he was here for a SANE screen. Again, I didn't know. I just knew that -- but Officer Quigley did tell me that he believed [Plaintiff] was a victim in this situation and that he needed to go get a rape kit done, and that's what he told me.

**Q. Okay.**

A. And that was very hard to hear as a mother.

**Q. Yes, ma'am. I can appreciate that.**

**And tell me what happened at Atrium.**



those boys were able to get alone in the same vicinity together.

There's a lot of things that could have been done differently to protect my son. And that is where I feel Madison Peele is negligent. She could have done more and took this very serious in the matter it was. This was the safety of my child and it wasn't something to be taken so lightly.

Her investigating and just say, for instance, if it was true, she went and talked to the boys and they said it was a prank, and then reported back to Principal Seale -- I mean Principal Sain, sorry, that that was the case, that is not her doing her due diligence to find out what was real.

I did not get called into a conference. This was not discussed. This was not even brought into light to even have a conversation. It was just I'm going go off what some nine-year-olds say? They said it was a prank and it's over, that's it?

**Q. You were called in to two conferences between March 21st and June 10, 2019, right?**

A. There were no -- I'm sorry. The conferences that I was called in to were referring to the IEP, sir. The IEP, the program that we had in place for [Plaintiff]. Nothing to do with the sexual assault.



Nothing to do with the text messages. Nothing to do with anything that was discussed in private with me and Madison Peele on those text messages. Or over the phone.

**Q. Did you ever raise it?**

A. It would have been -- my child was in the IEPs. And I was honestly not going to put on blast what was going on in that classroom in front of my child amongst seven other people.

This could have been handled in a different way. They could have, I mean, it's just -- there's negligence all over.

**Q. [Plaintiff] was in the IEP meetings?**

A. Yes, sir. He was in the IEP meetings.

**Q. Okay. Did you ever talk to him about things that he wants to raise at the IEP or things that he wants to talk about?**

A. No, sir. He was nine years old.

**Q. So do you ever talk to him about -- I mean, I know you talked about what's going on in school. I guess I would ask before, I'm asking before an IEP you never talked to him about anything that, you know, you want to bring up, anything you want me to bring up on your behalf, stuff like that. Was that ever discussed?**



A. This -[Plaintiff], I know you don't know [P] personally, but [Pla.] in his psychological reporting, he has social challenges. He doesn't, he doesn't know how to openly talk about things or things that are bothering him or concerning him and things like that.

So [Pla.] would not have requested for me to speak up or say anything during these IEPs about the sexual assault and the things that were happening to him.

**Q. Did you ever say in one of the IEPs, how are things going in terms of keeping [Pla.] and [Stu.X] separate?**

A. No, sir. On the record I did not ask that question out loud in the IEP.

**Q. Because my sense of what you just said is that this was such a serious thing that you think Madison is negligent, because she heard about all this and she didn't care, right? So I'm just asking if nobody else is bringing this up, is there a reason that you didn't yourself bring it up to say, hey, I haven't -- nobody has followed up with this on me. Nobody is telling me what's going on. I don't know if you're keeping [Pla.] and [Stu. X] apart or not. Can you tell me?**

**I'm just asking did you ever do that or did you not do that? I'm not trying to blame you, I'm**





A. Yes, I do.

**Q. So was Madison generally keeping you informed as to what was going on with [Pla.] in the classroom?**

A. Yes. I mean -- yes.

But I want to mind you that all of this behavioral stuff did not happen until after [Stu.X] came into the classroom. [Pla.] wasn't -- Ms. Peele and the Trilogy classroom as a whole was not having issues with [Pla.] until the harassment started happening with this other child.

**Q. So are you saying there's no evidence that [Pla.] had any issues with his behavior prior to January of 2019 when [Stu. X] showed up?**

A. I'm not saying that he didn't have any issues with his behavior. I'm saying he was not -- he was not over the top.

**Q. Okay. Then you responded the same day. Your first response says, "great." Then you wrote: His dad bailed on him yesterday for their plans for the weekend.**

**And followed up with, he has feelings about that, maybe your counselor can talk to him today.**

**So it's true that in response to Madison giving you this update about [Pla.]'s behavior, you**



**Q. [S.G.], [S.G], I'm going to just ask you: Did you make any complaints to the school about Madison Peele?**

A. Did I make any complaints to the school?

**Q. Yes.**

A. No, sir. Whenever all this came to light, the investigation started and nobody could talk to anybody in the school system at all --

**Q. After your text message to Madison on the 21st, did you tell anybody else in the school system about it?**

A. No. Because she was --

**Q. Hold on. Do you know what [Pla.] said in his CAC interview two days after this incident when asked about Madison Peele?**

A. No, sir. I wasn't present.

**Q. Okay. So you're not aware that when asked about Madison Peele, [Pla.] said that Madison Peele was a great teacher and anybody would be lucky to have her? Did you know that?**

A. That's great. That's great. I know [Pla.] loved Madison, I know he did. I know he did.

**Q. That's not what he said in his deposition. In his deposition he said that she didn't care about him, right?**

