IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| G.D., by and through his next friend, S.G., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:22-CV-1001 |
| KANNAPOLIS CITY SCHOOLS BOARD OF EDUCATION, MADISON PEELE, in her official and individual capacity, and JOSHUA SAIN, in his official and individual capacity, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Catherine C. Eagles, Chief District Judge.

The defendant Madison Peele moves for summary judgment on all claims against her by the plaintiff, a minor child referred to herein as G.D. G.D.'s claims arise out of sexual contact between G.D. and another child while they were students in Ms. Peele's class and under her supervision.

As the plaintiff agrees, Title IX does not authorize suit against individual school officials, so that claim against Ms. Peele will be dismissed. Because G.D. has not presented evidence sufficient to support an inference that Ms. Peele acted with discriminatory intent, engaged in willful or wanton conduct, or committed extreme and outrageous conduct, Ms. Peele's motion for summary judgment on the equal protection, gross negligence, intentional infliction of emotional distress, and grossly negligent

infliction of emotional distress claims will be granted.  But there are genuine disputes of material fact about Ms. Peele's supervision of G.D. and the degree of his injuries, and Ms. Peele's motion for summary judgment on the negligence and negligent infliction of emotional distress claims will be denied.

## I.    Procedural Background

In November 2022, G.D. filed a lawsuit against Kannapolis City Schools Board of Education, Joshua Sain, and Ms. Peele.  *See* Doc. 1 at 1, 18.  After he filed an amended complaint, *see* Doc. 30, and a motion to dismiss was granted in part, *see* Doc. 36 at 17–18, seven of the plaintiff's claims against Ms. Peele proceeded:  the Title IX claim and the equal protection, negligence, gross negligence, negligent infliction of emotional distress, grossly negligent infliction of emotional distress, and intentional infliction of emotional distress claims against Ms. Peele individually.  *See id.*  Discovery has concluded, and Ms. Peele now moves for summary judgment.  *See* Doc. 85.[1]

## II.    Facts

Some of the facts are undisputed.  To the extent they are not, the evidence is viewed in the light most favorable to the non-moving party, G.D.

G.D., then a ten-year-old boy, was one of three students enrolled in Forest Park Elementary School's Trilogy classroom during the 2018–19 school year.  *See* Doc. 84-1 at 26; Doc. 87 at 3.  The Trilogy classroom was "a therapeutic setting" that provided

---

[1] Dr. Sain moved for summary judgment separately, *see* Doc. 83, and has since settled with the plaintiff, subject to court review.  *See* Minute Entry 05/29/2024.  The Kannapolis Schools Board did not move for summary judgment, nor did G.D.

specialized instruction to children with mental health and behavior challenges, including "physical aggression." Doc. 91-2 at 12. Under school policy, students in the Trilogy classroom required "heightened adult supervision," so class size was limited; two teachers were assigned to the classroom to ensure at least one adult was monitoring students at all times. *Id.* at 13–14.

Ms. Peele was the Trilogy classroom director and lead teacher. *See id.* at 14–15. Toni Davis was the instructional assistant assigned to the Trilogy classroom. *See id.* Dr. Sain was the principal of the school, *see* Doc. 84-1 at 2–3, and responsible for student discipline. *See id.* at 4. He also supervised the school's teachers, *see id.* at 4–5, including Ms. Peele. *See id.* at 13–14.

The school had a policy requiring teachers to report any sexual harassment allegations to Dr. Sain. *See id.* at 16. Upon receiving reports, Dr. Sain decided how to proceed depending on the severity of the alleged harassment. *See id.* at 16–17. He classified an alleged offense as major or minor and addressed major offenses, like fighting and bullying, while delegating that responsibility to teachers for minor offenses. *See id.* at 17. If Dr. Sain was unable to classify the alleged offense based on the information available, he asked the teacher to interview the students and provide additional information before deciding how to proceed. *See id.* at 17–19.

G.D. was selected for the Trilogy classroom because of traumatic events in his past and his need for specialized instruction. *See* Doc. 90-1 at 5–6; Doc. 90-2 at 25–26. In December 2018, a licensed psychologist diagnosed G.D. with post-traumatic stress disorder. Doc. 87 at 5, 13. He witnessed episodes of domestic violence and had been

3

sexually abused as a young child; he "became full of rage" and had "behavioral outbursts." *Id.* at 5, 17, 31, 35, 39; Doc. 91-1 at 2–4. According to his mother, G.D. received treatment from "a psychiatric doctor, to help him with trauma." Doc. 91-1 at 4.

Student X, a male student of similar age, was also in the Trilogy class. *See* Doc. 84-1 at 29–30; Doc. 86-5 at 12. A record from his previous school shows that in March 2017, Student X was disciplined for "displaying inappropriate sexual behavior in the restroom" and that "there continue to be issues when the teacher is not present." Doc. 91-4 at 2. Ms. Peele testified that she did not remember anyone telling her about the March 2017 report of Student X's sexualized behaviors. *See* Doc. 86-2 at 8; Doc 91-3 at 11. She did remember other information from those records, such as reports that Student X "was having verbal and physical outbursts in the classroom." Doc. 92-5 at 1.

On March 21, 2019, S.G. reported to Ms. Peele that her son, the plaintiff G.D., had been subjected to sexual harassment by Student X. *See* Doc. 84-2 at 1. Via text messages to Ms. Peele, S.G. passed on G.D.'s report that Student X told G.D. to perform oral sex on him and to be "his boyfriend" and that Student X kissed G.D. on the cheek. *Id.* Ms. Peele responded via text that she would talk to Student X about it. *See id.* at 2.

The next day, Ms. Peele told Dr. Sain about the alleged harassment, *see* Doc. 84-1 at 20–21; Doc. 90-3 at 5–6, and they had a short conversation about it. Doc. 84-1 at 22. Ms. Peele confirmed she would investigate, and Dr. Sain asked her to report the findings to him. *See id.* at 24; Doc. 90-3 at 5–6.

Ms. Peele spoke to G.D. and Student X about the allegations. *See* Doc. 90-3 at 5. The evidence is conflicting as to what Ms. Peele then reported to Dr. Sain, though both

4

agree that the result was a conclusion that the alleged harassment did not happen. Ms. Peele testified that the students told her the harassment allegations were a joke and that this is what she told Dr. Sain. *See* Doc. 93-1 at 21. Dr. Sain testified that Ms. Peele told him that "there was never a time during the day when this could have happened" because the students had not been together at the time the alleged harassment purportedly took place. Doc. 84-1 at 25–26. Based on the information that the harassment did not occur, Dr. Sain and Ms. Peele did not take any further action, *see* Doc. 90-3 at 9–10, beyond Ms. Peele telling S.G. the harassment did not occur. *See* Doc. 84-1 at 26–27.

Shortly after Ms. Peele told S.G. the findings of the investigation, S.G. told Ms. Peele that her son was at particular risk of sexual abuse because of his history and "to keep [Student X] away from my son." Doc. 86-5 at 2–3. S.G. did not report any more harassment allegations before June 10, 2019. She did not raise the March 21, 2019, allegation again because she "thought Ms. Peele had handled it." *Id.* at 4–5. She did not raise concerns about Student X during two meetings she had with Ms. Peele before June 10, 2019, because G.D. was present. *See id.* at 9–10.

The parties have pointed to no evidence that G.D. made any further reports of sexual comments or demands by Student X to anyone until June 10, 2019. The parties have pointed to no evidence that Ms. Peele saw anything after March 21, 2019, that gave rise to any further concerns about interactions between the boys until June 10, 2019.

On June 10, 2019, G.D. and Student X went outside onto the playground with Ms. Peele's permission, *see* Doc. 91-3 at 15–16, 18, while a third student remained inside the Trilogy classroom. *See id.* at 13. Ms. Peele stood somewhere between the student in the

5

classroom and the students on the playground.  *See* Doc. 30-2 at 2 (stating she watched from window); Doc. 91-3 at 16 (stating she watched from doorway).  Ms. Peele testified that she "might have looked back to look at the other student that was in the [class]room" while she was also watching G.D. and Student X on the playground.  *Id.* at 23.

G.D. and Student X went behind a sign that was raised off the ground, so that from the classroom, Ms. Peele could only see the students "from their knees down."  *Id.* at 22. While they were there, Ms. Peele "noticed some awkward movements with their feet." *Id.* at 24; *see* Doc. 86-2 at 17–18.  She called the students over and questioned them about what they were doing, *see* Doc. 86-7 at 7, and they told her they had sexual contact.  *See e.g.,* Doc. 86-2 at 19.  After separating the students, Ms. Peele reported the incident to Dr. Sain.  *See* Doc. 84-1 at 32–33.

Once informed, Dr. Sain confirmed the students were separated and then notified school district administrators, law enforcement, and the students' parents.  *See id.* at 37– 39, 55.  He questioned Ms. Peele and asked her to provide a written statement.  *See id.* at 45–46.  He asked teachers to help the two students write statements about what occurred. *See id.* at 37–38.

During a medical evaluation later that day, G.D. told a physician that another student inserted his penis into G.D.'s anus, and S.G. told the physician that this assault brought his previous sexual assaults "back up."  Doc. 87 at 2.  The physician examined G.D. and noted that his scrotum, penis, and anus "appear normal without any evidence of external trauma" and that she did "not see any bruising or other physical injuries."  *Id.* at 2–3.

After the June 10, 2019, incident, Student X also received medical attention and testing. A penile swab from Student X found G.D.'s DNA. *See* Doc. 91-5 at 10.

During discovery, G.D. testified that Student X forced G.D. to perform oral sex on him, *see* Doc. 86-7 at 2, and that Student X "tried to penetrate my anus, but it failed." *Id.* at 4. He also testified that Student X told G.D. to try to penetrate Student X; G.D. attempted this once but no penetration occurred. *See id.* at 5–6.[2]

S.G. testified that as a result of the June 10, 2019, assault, G.D. has dissociated with others and does not engage with other children. *See* Doc. 91-1 at 15. She testified "even to this day, [G.D.] does not have a single friend, not one," *id.*, though she also testified that G.D. has had a girlfriend for almost a year. *See* Doc. 86-5 at 6. She also testified that since the assault, G.D. has changed "in every respect" and that "he's not receptive to being loved on anymore by his own family." Doc. 91-1 at 14–15. G.D. said that since the assault, he is "unable to be touched or hugged" and that he "has a difficult time trusting" others. Doc. 86-9 at 2.

After the assault, G.D. received outpatient cognitive behavioral therapy. *See generally* Doc. 92-4. On June 28, 2019, the counselor wrote in a progress note after G.D.'s first session that G.D. "presented for initial assessment and seemed to experience symptoms consistent with trauma exposure;" the progress note did not expressly mention any particular trauma and in the place to write "Significant Life Changes/Events," the

---

[2] There is a good bit of other evidence about what happened between these children on the playground, much of it conflicting. But for summary judgment purposes, the evidence is viewed in the light most favorable to the nonmoving party, which is the plaintiff here. *See Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

"N/A" box was checked.[3]  *Id.* at 1.  Despite treatment and at least one session with G.D.'s

mother, *see id.* at 2, G.D.'s condition worsened over the course of 2019.  *See generally id.*

By October 25, 2019, the counselor noted that G.D.'s "continued regression was evident,

with significant emotional and behavioral disturbances becoming more prominent in

sessions and reported at home."  *Id.* at 7.  Ultimately, the counselor determined that

outpatient care was insufficient, noting that "[t]here is a clear indication for more

structured and intensive support, which in-home care can provide."  *Id.* at 9.  While the

counselor's progress notes reference "the trauma," nothing in the written records

identifies the nature of the trauma, nor is there mention of an encounter with Student X

on June 10, 2019, or of a sexual assault by someone at school.  *See generally id.*

      The counselor later said in a February 8, 2024, letter that G.D. had been referred to

his clinic due to display of traumatic symptoms and reports of sexual abuse by an older

cousin and long-term domestic abuse.  *See* Doc. 92-3 at 1.  Nothing in his letter reflects

any mention by anyone of the June 2019 encounter with Student X or a sexual assault at

school.  *Id.*  The counselor diagnosed G.D. with post-traumatic stress disorder as a result

of the abuse by his cousin and exposure to domestic violence.  *Id.*[4]

      Additional facts will be included in the discussion, as necessary.

---

[3] The record does not reflect whether this means the information was not available or not applicable.

[4] The letter states that G.D. was eight years old when he was referred, *see* Doc. 92-3 at 1, but the counselor also says that his summary covers a one-month period of treatment, ending in July 2019, when G.D. was ten years old.  *See id.*; Doc 87 at 2.  The notes themselves show treatment continued through January 2020.  *See* Doc. 92-4 at 9.

8

## III. Discussion

A court "shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In analyzing a summary judgment motion, courts "construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Bandy v. City of Salem*, 59 F.4th 705, 709 (4th Cir. 2023).

### A. Title IX

Title IX of the Education Amendments of 1972 provides an implied private right of action, *see Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979), but it does "not authorize suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) (cleaned up). To prove a Title IX claim, a plaintiff must show that the defendant is an institution or program receiving federal funds. *See id.*

The plaintiff agrees that the Title IX claim against Ms. Peele should be dismissed, *see* Doc. 91 at 7, as she does not receive federal funds. Ms. Peele's motion for summary judgment on the Title IX claim will be granted.

### B. Equal Protection

To prevail on an equal protection claim based on deliberate indifference to known student-on-student sexual harassment, the plaintiff must prove: (1) he "was subjected to discriminatory peer harassment;" (2) "the school administrator responded to the

9

discriminatory peer harassment with deliberate indifference;" and (3) "the school administrator's deliberate indifference was motivated by a discriminatory intent." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 702–03 (4th Cir. 2018) (cleaned up). To prove the third element, the plaintiff must show that the defendant "intended to discriminate on the basis of a protected class." *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010).[5] Here, G.D. asserts that he is protected on the basis of his sex. *See* Doc. 30 at ¶ 38.

Generally, to prove discriminatory intent, the plaintiff must show that the decisionmaker "selected or reaffirmed a particular course of action at least in part because of . . . its adverse effects upon an identifiable group." *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 883 (4th Cir. 2023) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up). In the deliberate indifference to sexual harassment context, "[d]iscriminatory intent can be inferred where a defendant knows of sexual harassment but takes little or no action to remedy the abuse." *M.B. v. Chapel Hill-Carrboro City Schs. Bd. of Educ.*, No. 20-CV-796, 2021 WL 4412406, at *5 (M.D.N.C. Sept. 27, 2021); *see also Hurley*, 911 F.3d at 703 (inferring discriminatory intent from allegations defendant downplayed harassment, made no effort to stop it, and "ratified" it).

Here the plaintiff proffers no direct evidence of Ms. Peele's discriminatory intent, such as a pattern of inaction following repeated sexual harassment claims by male students or a different response to claims of harassment by female students. Instead,

---

[5] While *Grindle* is not binding precedent in the Fourth Circuit, the Fourth Circuit cited it repeatedly and positively in *Hurley*. *See* 911 F.3d at 701, 703.

10

G.D. relies on circumstantial evidence, contending that Ms. Peele's response to the initial report of sexual harassment in March 2019 was so insufficient that discriminatory intent can be inferred. *See* Doc. 91 at 7–9.

The undisputed evidence shows that Ms. Peele took prompt action after S.G. told her about sexual harassment of G.D. by another student. *See* Doc. 84-1 at 20–21; Doc. 90-3 at 5–6. She followed school policy by telling Dr. Sain about the harassment allegations, investigating the allegations, and reporting the investigation findings to Dr. Sain. *See* Doc. 84-1 at 24; Doc. 90-3 at 5–6. After her investigation, which included talking with the students, Ms. Peele told Dr. Sain and S.G. that no sexual harassment occurred. *See* Doc. 93-1 at 21; Doc. 84-1 at 26–27. There were no previous reports of sexually-oriented behavior between the two students, and none were reported thereafter to Ms. Peele before June 10, 2019. *See* Doc. 84-1 at 29; Doc. 86-7 at 13–14. S.G. was told of this conclusion and thereafter did not report any other harassment allegations. *See* Doc. 86-5 at 4–5, 9–10. All students in the Trilogy classroom were supervised closely under the program design, and there is no evidence that the supervision level decreased after the harassment allegation in March 2019. *See* Doc. 91-3 at 10–11 (testimony that students were watched closely after the report, speaking generally).

G.D. compares this case to *Hurley* and *Grindle*, cases where the court drew an inference of discriminatory intent. *See* Doc. 91 at 7–9 (citing *Hurley*, 911 F.3d at 703; *Grindle*, 599 F.3d at 589). But those cases are very different from this one.

In *Hurley*, the defendants "downplay[ed] the harassment" by questioning the seriousness of the reported harassment at a campus meeting and sending a generic email

11

to the student body that did not specifically address the reported harassment. 911 F.3d at 681, 690, 703. Here in contrast, Ms. Peele took the allegations seriously; she immediately told S.G. that she would look into the allegation, she reported the allegation to Dr. Sain, she talked to the children about the claim, and she reported back to both S.G. and Dr. Sain. In *Hurley*, the defendants "never investigated the harassment and threats," after they received multiple reports of reoccurring threats and evidence of hundreds of threatening online posts. *Id.* at 703. Here there was one allegation, which Ms. Peele investigated and determined to be unsubstantiated. She then provided information about her investigation to Dr. Sain so that, in accordance with school policy, he could decide if further action was appropriate. No reasonable jury could infer from this circumstantial evidence that Ms. Peele acted with discriminatory intent against male students by not taking further action.

In *Grindle*, the court concluded that a jury could reasonably infer intent to discriminate because there was evidence that the defendant school principal knew a male teacher was abusing female students and "deliberately helped cover it up." *Grindle*, 599 F.3d at 589. Here, in contrast, as soon as she learned of the alleged harassment in March 2019, Ms. Peele reported it to Dr. Sain and assisted him in following the school's policy to investigate. *See supra* at 4–5. Similarly, in June 2019, when she noticed the students' unusual movements behind a sign on the playground, *see* Doc. 86-2 at 17–18; Doc. 91-3 at 24, she immediately called the students over and questioned them about what they were doing. *See* Doc. 86-7 at 7; Doc. 86-2 at 19. When they told her they engaged in sexual contact, she immediately separated them and then informed Dr. Sain. *See* Doc.

12

84-1 at 32–33, 37.  There is no evidence that Ms. Peele concealed or downplayed any reports of sexual harassment, nor is there anything to give rise to an inference that she responded to the events with discriminatory intent because two boys were the subject of the complaints.

The evidence is not sufficient to allow a reasonable jury to find that Ms. Peele acted with discriminatory intent.  In the absence of evidence on this necessary element, it is not necessary to address other elements of this cause of action.[6]  Ms. Peele's motion for summary judgment on the equal protection claim against her in her individual capacity will be granted.

### C.     Negligence

"The essential elements of any negligence claim are the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff."  *Harris v. Daimler Chrysler Corp.*, 180 N.C. App. 551, 555, 638 S.E.2d 260, 265 (2006).  A teacher has a duty to "abide by that standard of care which a person of ordinary prudence, charged with her duties, would exercise under the same

---

[6] In her reply brief, Ms. Peele raises for the first time that a teacher is not a school administrator under North Carolina law and contends she is "likely not subject to Equal Protection claims."  Doc. 92 at 12 n.10 (citing *Farrell ex rel. Farrell v. Transylvania Cnty. Bd. of Educ.*, 199 N.C. App. 173, 177, 682 S.E.2d 224, 228 (2009)).  The Court declines to consider a perfunctory argument in a footnote, *see Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1320 n.3 (Fed. Cir. 2005) (refusing to address an undeveloped argument raised in a footnote), especially when it is first raised in a reply brief.  *See, e.g.*, *Price v. Grasonville Volunteer Fire Dep't*, No. 14-CV-1989, 2014 WL 7409891, at *8 (D. Md. Dec. 30, 2014) (noting general rule that courts decline to consider arguments first raised in reply briefs and collecting cases).

13

circumstances." *Kiser v. Snyder*, 21 N.C. App. 708, 710, 205 S.E.2d 619, 621 (1974) (cleaned up). "[F]orseeability of harm to pupils in the class or at the school is the test of the extent of the teacher's duty to safeguard her pupils from dangerous acts of fellow pupils." *James ex rel. James v. Charlotte-Mecklenburg Bd. of Educ.*, 60 N.C. App. 642, 648, 300 S.E.2d 21, 24 (1983).

A reasonable jury could find in favor of the plaintiff on his negligence claim on the evidence presented. A jury could conclude that Ms. Peele had a legal duty to monitor the students in the Trilogy classroom closely, given their special needs and histories and the nature of the program, that she breached that duty by permitting students with known behavioral and mental health challenges and histories of physical aggression to go on the playground by themselves, and that it was foreseeable this limited supervision could result in harm to one or both students.

Ms. Peele was aware that the Trilogy classroom was "for children with behavioral needs," Doc. 86-2 at 5, and the school policy handbook said the Trilogy students had to be monitored closely. *See id.* at 7. She was also aware of "many incidents where [Trilogy classroom] students had physical reactions" and worried about her ability to monitor and control the students without additional staffing support. Doc. 90-3 at 3–4. She knew G.D. had told his mother about sexual harassment by Student X and that G.D. was vulnerable to sexual abuse. *See* Doc. 84-2; Doc. 86-5 at 2–3. A jury could infer that she knew of Student X's earlier history of sexualized conduct at a prior school. Yet she did not go out on the playground with the boys, and she divided her attention between watching one student inside the classroom and two students on the playground. *See* Doc.

14

86-2 at 13–14; Doc. 91-3 at 23. Dr. Sain testified that in his opinion Ms. Peele should have been closer to the boys while they were on the playground. *See* Doc. 91-2 at 28.[7]

The plaintiff has also presented evidence that would allow a reasonable jury to find that G.D. suffered an injury proximately caused by this negligence. G.D. testified that while on the playground without Ms. Peele, Student X forced him to engage in oral sex and attempts at anal sex. *See* Doc. 86-7 at 2, 4. Expert testimony is not necessary for a jury to conclude that a physical sexual assault, including actual or attempted anal penetration and forced oral sex, between inadequately supervised children prone to physical aggression would result in injury, such as emotional pain and mental suffering. *See Taylor v. Shreeji Swami, Inc.*, 820 F. App'x 174, 176 (4th Cir. 2020) (holding expert testimony unnecessary to prove causation when "the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries").[8]

That mental suffering would be the ordinary and proximate result of a sexual assault, even without evidence of physical trauma, "is too plain to admit of argument." *Kyles v. S. Ry. Co.*, 147 N.C. 394, 61 S.E. 278, 280 (1908) (holding the same about

---

[7] Ms. Peele contends that this testimony would not be admissible at trial. *See* Doc. 92 at 9–10. Depending on how the question and answer are worded, perhaps that will turn out to be so. But Dr. Sain was Ms. Peele's supervisor and responsible for evaluating her classroom performance, and it is undisputed that the students in the Trilogy classroom required near-constant supervision. His testimony reflects his general view that she did not meet the school's expectations as to supervision. Whether his evaluation about her performance supervising students will be admissible will be better evaluated at trial, in light of the specific question asked and where any Rule 403 concerns can be evaluated in context.

[8] In *Taylor*, the court found that evidence from a medical expert was required on the facts presented. *See* 820 F. App'x at 177–78. But being trapped in an elevator for 30 minutes on the first floor, *see id.* at 175, is significantly different from a forced sexual encounter involving oral sex and actual or attempted anal sex.

15

mutilation of remains of a deceased husband).  And it has long been the rule that mental injury is simply another type of injury, like physical and pecuniary injuries, for which a plaintiff can recover in a negligence case.  *See Johnson v. Ruark Obstetrics and Gynecology Assocs., P.A.*, 327 N.C. 283, 292–93, 395 S.E.2d 85, 90–91 (1990) (summarizing decades of case law).

That said, the plaintiff has produced no evidence linking the assault on June 10, 2019, to any specific mental health condition.  Such testimony is required for the plaintiff to prove that a specific mental health condition was caused or exacerbated by negligence. *See Taylor*, 820 F. App'x at 176–78 (noting that lay testimony about exacerbation of post-traumatic stress disorder and other conditions that resulted from being trapped in an elevator is insufficient to show causation, as those injuries are "so far removed from the usual and ordinary experience of the average man that expert knowledge is essential"). To the extent the plaintiff contends he has a mental health injury caused or exacerbated by Ms. Peele's negligence, Ms. Peele is entitled to summary judgment.

Ms. Peele contends that she had no legal duty to monitor the students because three text messages and a phone call do not make a sexual assault foreseeable.  *See* Doc. 86 at 19.  First, "the plaintiff does not have to prove that the defendant foresaw the injury in its precise form." *Williamson v. Liptzin*, 141 N.C. App. 1, 10, 539 S.E.2d 313, 319 (2000).  And here, the possibility of an assault was foreseeable; as Ms. Peele knew her students had "behavioral needs," Doc. 86-2 at 5, and was aware of "many incidents where students had physical reactions" that worried her.  Doc. 90-3 at 3–4; *see James*, 60 N.C. App. at 648 (finding teacher has duty "to safeguard her pupils from dangerous acts

16

of fellow pupils" once she becomes aware of student conduct that is of "an assaultive or dangerous nature"). As she acknowledges, Ms. Peele knew there had been a previous report of sexual harassment, and S.G. expressed concerns about G.D. and Student X being together because of G.D.'s history of sexual abuse. *See supra* at 4–5.

Ms. Peele also maintains that G.D. cannot prove proximate causation because he had the same mental health problems before June 10, 2019, and because he offers no expert testimony the sexual contact in June caused or exacerbated those problems. *See* Doc. 86 at 21–23. To a certain extent, that is so; as previously discussed, the plaintiff has presented no evidence from a medical expert about causation. But that lack of evidence does not necessarily mean that G.D. was not injured at all by Ms. Peele's negligence. As already addressed, a jury could find that G.D. experienced mental suffering from the physical sexual assault caused by negligent oversight. The fact that G.D. cannot show causation for some kinds of injury does not mean he has suffered no injuries. [9]

---

[9] The parties have discussed injury as an element of the claim but have not directly discussed the kinds of damages G.D. can recover. There is overlap between the two, but they are distinct questions that should not be confused. *See generally Blakeley v. Town of Taylortown*, 233 N.C. App. 441, 448, 756 S.E.2d 878, 883 (2014) (noting a litigant's confusion between emotional distress as a type of tort damage with emotional distress constituting a specific element in a cause of action). Damages for negligence include general damages for emotional suffering. *See e.g.*, *Iadanza v. Harper*, 169 N.C. App. 776, 780, 611 S.E.2d 217, 221 (2005); *accord Robertson v. Stanley*, 285 N.C. 561, 565, 206 S.E.2d 190, 193 (1974) (noting that a plaintiff "is to have a reasonable satisfaction for actual suffering, physical and mental, which are the immediate and necessary consequences of the injury"). Unlike a claim for negligent infliction of emotional distress, where severe emotional distress is a required element of a claim, *see* discussion *infra* at 20, there is no requirement that a plaintiff show severe emotional distress to recover mental pain and emotional suffering damages from negligence. *See Blakeley*, 233 N.C. App. at 448.

Finally, Ms. Peele contends that because G.D. has made divergent statements over time about the nature of the sexual contact, she is entitled to summary judgment. G.D. has consistently said there was such contact, however, and this is not a case where a plaintiff says one thing in a deposition and another in opposition to summary judgment. These discrepancies can be resolved by the jury.

Ms. Peele's motion for summary judgment on the negligence claim will be granted in part to the extent the plaintiff claims any specific diagnosable mental health condition was caused or exacerbated by Ms. Peele's negligence on June 10, 2019. Otherwise, her motion to dismiss this claim will be denied.

### D. Gross Negligence

To prevail on a claim for gross negligence, the plaintiff must first establish the elements of negligence, *see Est. of Long ex rel. Long v. Fowler*, 270 N.C. App. 241, 253, 841 S.E.2d 290, 299 (2020), and then show that the defendant engaged in willful or wanton conduct. *See Cullen v. Logan Devs., Inc.*, 289 N.C. App. 1, 9, 887 S.E.2d 455, 461 (2023). "Willful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another." *Id.* (cleaned up). "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *Yancey v. Lea*, 354 N.C. 48, 52, 550 S.E.2d 155, 157–58 (2001) (quoting *Foster v. Hyman*, 197 N.C. 189, 148 S.E. 36, 37–38 (1929)). The difference between negligence and gross negligence is not the "degree or magnitude of inadvertence or carelessness, but rather is intentional wrongdoing or deliberate misconduct affecting the safety of others." *Id.* at 53.

18

Here, there is no evidence that Ms. Peele acted with a deliberate purpose not to discharge her duty to monitor the students, nor is there any evidence she acted with a malicious purpose intending to cause G.D. harm. The evidence is undisputed that Ms. Peele was keeping an eye on the students, even if she was not physically close and even if that supervision was not constant. *See* Doc. 30-2 at 1–2; Doc. 86-2 at 14–15; Doc. 91-3 at 22–23. As soon as Ms. Peele noticed the students' unusual feet movements under the sign on the playground, she immediately intervened, questioned them about what occurred, separated the students, and then reported the information to her supervisor. *See* Doc. 30-2 at 1–2; Doc. 84-1 at 32–33; Doc. 91-3 at 22–24.

The plaintiff contends that Ms. Peele left the students alone for 14 minutes and that this supports an inference of a deliberate purpose. *See* Doc. 91 at 4, 15–16. While there is evidence that G.D. and Student X were on the playground together for 14 minutes, *see* Doc. 91-3 at 19, the plaintiff has cited no evidence to support his implicit contention that they were completely unsupervised and unobserved for 14 minutes. The evidence shows that Ms. Peele was watching the students during this period, even though she was not physically on the playground and her attention was divided between students inside and out of the classroom. *See* Doc. 30-2 at 2; Doc. 86-2 at 14–15; Doc. 91-3 at 22–23. Ms. Peele testified about various activities G.D. and Student X engaged in on the playground during those 14 minutes, showing that she did not leave the students completely unsupervised. *See* Doc. 91-3 at 19–22 (recalling that Student X and G.D. played in a rain puddle, walked along a landscaping beam, and pushed each other on swings before going behind sign where sexual contact occurred.). G.D. also testified that

19

Ms. Peele was watching the students on the playground from behind a glass door to the classroom. *See* Doc. 86-7 at 7.

A reasonable jury could not find gross negligence on this record because there is no evidence Ms. Peele acted with a deliberate purpose not to discharge her duty or with a malicious purpose to cause G.D. harm. Ms. Peele's motion for summary judgment as to the gross negligence claim will be granted.

### E. Negligent Infliction of Emotional Distress

To prevail on a claim for negligent infliction of emotional distress, a plaintiff must prove: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress (often referred to as 'mental anguish'), and (3) the conduct did in fact cause the plaintiff severe emotional distress." *Johnson*, 327 N.C. at 304.

Severe emotional distress "means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.* "Put more succinctly, a plaintiff must present evidence of diagnosable mental health conditions." *Foster v. Crandell*, 181 N.C. App. 152, 170, 638 S.E.2d 526, 538 (2007) (cleaned up).

A reasonable jury could find in G.D.'s favor on the negligent infliction of emotional distress claim on the evidence presented. A jury could, as already discussed, *see supra* at 14–15, conclude that Ms. Peele acted negligently by permitting students with known behavioral and mental health challenges and histories of physical aggression to go

20

onto the playground by themselves and that it was foreseeable such limited supervision could result in harm, including severe emotional distress. Ms. Peele knew the Trilogy classroom was for students with behavioral needs, school policy required close supervision, G.D. had recently alleged that Student X had sexually harassed him, and G.D. was vulnerable to sexual abuse. *See* Doc. 86-2 at 5, 7; Doc. 84-2; Doc. 86-5 at 2–3. Yet Ms. Peele did not go onto the playground with the boys, and she divided her attention between watching one student inside and two students outside of the school building. *See* Doc. 86-2 at 14; Doc. 91-3 at 22–23.

A reasonable jury could also conclude that the assault on June 10, 2019, caused G.D. severe emotional distress. S.G. testified that G.D.'s behavior changed "in every respect" after the June 10, 2019, assault and that he has dissociated with others and does not engage with other children.[10] *See* Doc. 91-1 at 15. She also testified that he does not like "being loved on anymore by his own family." *Id.* at 14. G.D. said he is "unable to be touched or hugged" and that he "has a difficult time trusting" others. Doc. 86-9 at 2.

Ms. Peele contends that G.D. cannot show that her conduct caused him severe emotional distress because he has not presented any evidence of "a disabling emotional or mental condition diagnosed by professionals trained to do so." Doc. 86 at 25; *see also* Doc. 92 at 4–5. Ms. Peele is correct that G.D. has produced no evidence showing the assault on June 10, 2019, caused or exacerbated his preexisting medical conditions. In

---

[10] S.G. also testified that G.D. was diagnosed with disassociation disorder, *see* Doc. 91-1 at 15, but there is no evidence of such medical diagnosis in the record. A lay witness may not testify about such specialized knowledge and is limited to offering opinions based only on her perceptions, so the Court will not consider that statement. *See* FED. R. EVID. 701.

his answer to interrogatories, G.D. said he seeks damages from the assault for post-traumatic stress disorder, anxiety, and depression, *see* Doc. 86-9 at 2, but he had already been diagnosed with those conditions before the assault occurred. *See* Doc. 87 at 10, 13, 22. The reports from G.D.'s counselor do not show that G.D.'s post-traumatic stress disorder or any of his behavioral challenges were caused or exacerbated by the June 10, 2019, assault, *see* Doc. 92-4; Doc. 92-3 at 1, and lay statements from G.D. and S.G. are insufficient for establishing that causal link. *See Taylor*, 820 F. App'x at 176; *see* discussion *supra* at 16. To the extent the plaintiff contends his preexisting mental health conditions were caused or exacerbated by Ms. Peele's negligent infliction of emotional distress, Ms. Peele is entitled to summary judgment.

But this does not necessarily preclude G.D.'s negligent infliction of emotional distress claim. Expert testimony is not required for a jury to conclude that a physical sexual assault between inadequately supervised children with histories of physical aggression could and did result in severe emotional distress. *See Williams v. HomEq Servicing Corp.*, 184 N.C. App. 413, 419, 646 S.E.2d 381, 385 (2007).

In its most recent review of the issue, the North Carolina Court of Appeals reaffirmed that "severe emotional distress does not require medical expert testimony." *Clark v. Clark*, 280 N.C. App. 403, 415, 867 S.E.2d 704, 715 (2021). In *Clark*, a jury found one defendant intentionally inflicted emotional distress on the plaintiff when the defendants, among other things, published nude photos of plaintiff online. *See id.* at 409–10, 415. The court upheld the verdict, concluding that the plaintiff's testimony that as a result of the defendant's conduct, she cried hysterically and hyperventilated along with

22

her friend's testimony that plaintiff was distraught, cried regularly, and had anxiety was sufficient to show she suffered severe emotional distress. *See id.* at 415. The court also held that such lay testimony was sufficient to establish causation, even where the plaintiff had some preexisting emotional or mental health conditions, because the plaintiff did not rely solely on evidence of the preexisting condition and offered evidence of some new effects resulting from the defendants' conduct. *See id.* at 416.

Here G.D. has presented lay testimony that is sufficient to show severe emotional distress. First, the nature of the sexual assault itself, viewed in the light most favorable to the plaintiff, is the kind of conduct likely to result in severe emotional distress. Second, this common-sense inference is supported by testimony from G.D. that he is now "unable to be touched or hugged" and that he "has a difficult time trusting" others, Doc. 86-9 at 2, and from G.D.'s mother that his behavior changed "in every respect" after the assault, with specific examples given. Doc. 91-1 at 14–15. The testimony also supports causation because it shows at least some new effect of the assault beyond G.D.'s preexisting conditions.

Ms. Peele's motion for summary judgment on the negligent infliction of emotional distress claim will be granted in part to the extent the plaintiff claims Ms. Peele's negligence on June 10, 2019, caused or exacerbated his preexisting mental health conditions. Otherwise, her motion for summary judgment on this claim will be denied.

In the amended complaint, G.D. also appears to allege a separate claim for "Grossly Negligent Infliction of Emotional Distress." Doc. 30 at ¶¶ 58–64. Summary judgment will be granted on that claim as well; as discussed, there is no evidence Ms.

23

Peele had a deliberate purpose not to discharge her duty or a malicious purpose to cause G.D. harm. *See supra* at 18–20.

## F. Intentional Infliction of Emotional Distress

To prove intentional infliction of emotional distress, a plaintiff must show the defendant committed "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Crandell*, 181 N.C. App. at 167 (cleaned up). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious." *Id.* at 168.

There is no evidence that Ms. Peele acted in an extreme, atrocious way. As previously discussed, *see supra* at 11–12, Ms. Peele complied with school policy when she received the harassment report in March 2019. She told her supervisor, *see* Doc. 84-1 at 20–21; Doc. 90-3 at 5–6, spoke to G.D. and Student X and determined the allegation was unfounded, *see* Doc. 90-3 at 5, and then reported that finding to her supervisor and S.G. Doc. 84-1 at 26–27. Similarly, when Ms. Peele noticed unusual activity on the playground in June 2019, she immediately intervened, questioned the students, separated them, and then reported to her supervisor. *See* Doc. 30-2 at 1–2; Doc. 84-1 at 32–33, 37.

A reasonable jury could not find that a teacher who follows the school's anti-harassment policy and responds to and reports inappropriate student conduct exercised outrageous conduct. Without evidence on this necessary element, it is not necessary to address whether there are disputed factual questions about other elements. Ms. Peele's

24

motion for summary judgment on the intentional infliction of emotional distress claim will be granted.

## IV. CONCLUSION

Ms. Peele is entitled to summary judgment on G.D.'s claims for negligence and negligent infliction of emotional distress to the extent G.D. claims his diagnosable mental health conditions were caused or exacerbated by Ms. Peele's negligence, but otherwise those claims may proceed. As to these negligence claims, there are many issues of disputed fact. A jury may or may not find a sexual assault occurred. A jury may or may not find that Ms. Peele should have supervised the boys more carefully. A jury may or may not find that G.D. suffered mental pain and suffering caused by any assault or negligent oversight or that such emotional distress was severe. It will be up to the jury to sort through and weigh the evidence presented at trial, subject to appropriate instructions.

Ms. Peele is otherwise entitled to summary judgment on all other claims against her, as there are no disputed questions of material fact.

It is **ORDERED** that the motion for summary judgment filed by the defendant, Madison Peele, Doc. 85, is **GRANTED in part and DENIED in part** as follows:

1. The Title IX, equal protection, gross negligence, grossly negligent infliction of emotional distress, and intentional infliction of emotional distress claims are **DISMISSED**;

2. The negligence and negligent infliction of emotional distress claims are **DISMISSED** to the extent G.D. says he has a specific diagnosable mental health condition caused or exacerbated by the events of June 10, 2019;

3.  The motion is otherwise **DENIED** as to the negligence and negligent

    infliction of emotional distress claims, which will proceed to trial as

    narrowed here.

This the 4th day of June, 2024.

_____

UNITED STATES DISTRICT JUDGE